IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

SANDRA D. FANNING,                          *
                                            *
            Plaintiff,                      *
                                            *
vs.                                         *          No. 4:07CV01194 SWW
                                            *
JOHN E. POTTER, in his official capacity as *
POSTMASTER GENERAL of the UNITED            *
STATES POSTAL SERVICE,                      *
                                            *
            Defendant.                      *

**MEMORANDUM OPINION AND ORDER**

Sandra D. Fanning ("Fanning") brings this case against the United States Postal Service ("USPS") alleging breach of a settlement agreement and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.* The case is set for trial the week of February 23, 2009. Now before the Court is defendant's motion for summary judgment, plaintiff's response, and defendant's reply. After careful consideration, and for the reasons stated below, the Court finds that the motion for summary judgment should be granted.

**Background**

Fanning started working for the USPS on June 5, 1995, as a data conversion operator. On April 21, 2000, she was assaulted by a co-worker and suffered bodily injury. On July 13, 2000, the Office of Workers Compensation Program ("OWCP") accepted a claim Fanning filed for strain of the right leg and contusion of the right arm and hand. On August 17, 2000, the OWCP accepted Fanning's claim for post-traumatic stress in connection with the assault. On July 20, 2000, and

August 11, 2000, the USPS sent letters to the OWCP, challenging Fanning's claims and asking the OWCP to reconsider its decision that her claims were work-related.  *See* Def's. Mem. in Supp. Mot. Summ. J., Exs. 8 & 9.  Fanning's last day in a pay status was September 8, 2000.  Since then, she has been on the periodic rolls maintained by the OWCP.[1]

On December 22, 2000, Fanning filed a complaint alleging sex discrimination and retaliation under Title VII and state law claims of assault and battery.  *Fanning v. Potter,* 4:00cv00948 WRW. In November 2003, the parties entered into a settlement agreement.  Under pertinent provisions, the USPS agreed not to challenge the legitimacy of Fanning's currently accepted OWCP claim or to provide the independent medical examination records and reports of Dr. Diner to the Department of Labor; not to oppose her application for disability retirement; and not to change her leave-without-pay employment status while her application is pending and during any reconsideration of her application.  Fanning agreed not to reapply for work with the USPS and to look into applying for disability retirement and other available options.  Compl., Ex. 1.

Fanning received compensation from OWCP because she was unable to work as a result of her on-the-job injury, PTSD.  The OWCP deducted the health insurance premiums from Fanning's compensation checks at the rate for other federal employees, which is higher than the rate paid by USPS employees.  Under the USPS's Health Benefits Refund Program[2], Fanning was entitled to be

---

[1]USPS Handbook EL-505, *Injury Compensation,* Section 11 <u>Rehabilitation Program,</u> provides "*Regular-periodic-roll (PR) status* applies to both current and former employees who have been medically determined to be totally disabled for an extended or indefinite period."  Def's. Statement of Uncontested Facts, ¶ 11.

[2]USPS Handbook EL-505, *Injury Compensation,* Section 4.24, the Health Benefits Refund Program is designed to reimburse injured employees for an overdeduction of health benefits premiums by OWCP. Def's. Statement of Uncontested Facts, ¶ 14.

reimbursed for the over deduction of health benefits premiums by the OWCP. This is done on a quarterly basis. Plaintiff received approximately $1,200.00 per year in health benefits refund payments from USPS.

On January 17, 2006, Fanning filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), Case No. 4G-720-0033-06, alleging that on December 15, 2005, and prior, she did not receive her quarterly health benefits refund payments because of discrimination based on race, color, sex, disability, and reprisal for prior EEO activity. Compl., Ex. 2; Def's. Mem. in Supp. Mot. Summ. J., Ex. 1. On or about April 6, 2006, Fanning filed another complaint, Case No. 1G-721-0018-07, alleging discrimination on the basis of race, color, sex, physical and mental disability, and retaliation when (1) she became aware in February 2007 that she had been separated from the USPS; and (2) on January 26, 2007, when she was notified that her life insurance was cancelled. Compl., Ex. 3. On September 11, 2007, the USPS issued a Final Agency Determination in Case No. 1G-721-0018-07 that the USPS did not discriminate against Fanning. Compl., Ex. 4. On November 14, 2007, the Administrative Law Judge in Case No. 4G-720-0033-06, issued a Decision Without a Hearing finding the USPS did not discriminate against Fanning, and the USPS adopted that decision on December 4, 2007. Compl, Ex. 5.

On December 14, 2007, Fanning filed the complaint before the Court, alleging defendant breached the settlement agreement by (1) conspiring to terminate plaintiff's OWCP benefits; (2) conspiring to terminate plaintiff's status as an employee with the USPS; and (3) conspiring to deny plaintiff the quarterly refund payments to which she was entitled. She also claims defendant retaliated against her for "prior EEO activity and litigation against the USPS" by "actively

conspir[ing] to controvert and/or terminate her accepted OWCP benefits," "fail[ing] to provide her with timely benefits to which she was entitled," and "separat[ing] the Plaintiff from the USPS." Compl. at ¶ ¶ 22-24.

In its motion for summary judgment, defendant contends that because Fanning did not allege race, color, sex, or disability discrimination in her complaint, the only discrimination claim properly before the Court is retaliation.  It also argues Fanning failed to exhaust her administrative remedies as to her retaliation claim that "the USPS actively conspired to controvert and/or terminate her accepted OWCP benefits."  Defendant asserts Fanning cannot establish a *prima facie* case on her claim of retaliation as to her quarterly health benefit refund payments and, in the alternative, cannot show the articulated reasons are a pretext for discrimination.  Defendant argues Fanning cannot show the articulated reasons for her separation and cancellation of her life insurance are pretextual. Finally, defendant argues there is no evidence to support a finding that it violated the settlement agreement.

**Standard of Review**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).  As a prerequisite to summary judgment, a moving party must demonstrate "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  Once the moving party has properly supported its motion for summary judgment, the non-moving party must "do more than simply show there is some metaphysical doubt as to the

4

material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The non-moving party may not rest on mere allegations or denials of her pleading but must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 587 (quoting Fed.R.Civ.P. 56(e)).

"[A] genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party." *RSBI Aerospace, Inc. v. Affiliated FM Ins. Co.,* 49 F.3d 399, 401 (8th Cir. 1995). The inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Matsushita,* 475 U.S. at 587 (citations omitted). "Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim." *Arnold v. Nursing and Rehab. Ctr. At Good Shepherd, LLC,* 471 F.3d 843, 845-6 (8th Cir. 2006)(internal citation omitted).

## Discussion

The Court first addresses Fanning's discrimination claims and then her breach of settlement agreement claims.

### 1. Retaliation

Title VII prohibits retaliation against an employee who files charges of discrimination or assists others in opposing discrimination. 42 U.S.C. § 2000e-3(a); *Thompson v. Bi-State Dev. Agency,* 463 F.3d 821 (8th Cir. 2006). Absent direct evidence of retaliation, the Court must apply the *McDonnell Douglas* three-part burden-shifting analysis to plaintiff's retaliation claims. *Id.* at 826.

Under this framework, the Court must first determine whether plaintiff has presented a *prima facie* case of retaliation. *Id.* To make a *prima facie* case, plaintiff must show: 1) she engaged in protected conduct; 2) a reasonable employee would have found the challenged retaliatory action materially adverse; and 3) the materially adverse action was causally linked to the protected conduct. *See Burlington Northern & Santa Fe Ry. Co. v. White,* 548 U.S. 53 (2006); *Higgins v. Gonzales,* 481 F.3d 578, 589 (8th Cir. 2007).

The purpose of the anti-retaliation provision is "to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington Northern,* 548 U.S. at 68 (internal citations omitted). "[P]etty slights, minor annoyances, and simple lack of good manners will not create such deterrence." *Id.* The Supreme Court emphasized that context and the particular circumstances of any given act of retaliation are to be considered in applying the standard set forth. *Id.* at 69. The Supreme Court clarified that "the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the Title VII complaint. By focusing on the materiality of the challenged action and the perspective of a reasonable person in the plaintiff's position, we believe this standard will screen out trivial conduct while effectively capturing those acts that are likely to dissuade employees from complaining or assisting in complaints about discrimination." *Id.* at 69-70.

**a. Health Benefit Refund Payments**

Defendant argues Fanning cannot establish a *prima facie* case of retaliation because 1) a delay in paying health benefit refunds is not a materially adverse employment action and 2) there is

no causal connection.  Plaintiff admits she received all of her payments scheduled from July 2001 through April 15, 2006.  She contends, however, that some of the payments were not issued until after she filed her EEO complaint, and that few were issued without her complaining to the USPS on the district, area, and national level.  In some instances, Fanning complained to her congressman.

The standard under *Burlington Northern* is objective and asks the Court to consider what a reasonable employee would do in Fanning's situation.  *Higgins, supra.*   The alleged retaliatory actions  must be material, producing significant rather than trivial harm.  *Gilbert v. Des Moines Area Community College,* 495 F.3d 906 (8th Cir. 2007).  Unlike the plaintiff in *Burlington Northern,* Fanning has not shown the delays in payment were materially adverse.  While the late payments may have been annoying and frustrating, they did not keep plaintiff from having health insurance, and there is no evidence the late payments deterred plaintiff from reporting the alleged discriminatory conduct.  Plaintiff admits she complained to high-ranking USPS officials and her congressman.

Defendant also contends Fanning cannot show a causal connection between her protected activity and the adverse action.  Fanning began receiving quarterly health benefit refund payments in July 2001.  The record reflects that Fanning filed a total of six formal EEO complaints in 2000 and 2001, the last of which was closed in April 2002.  Her 2000 federal lawsuit against the USPS was settled in November 2003.  Although Fanning wrote letters to her congressman and to upper management as late as July 2004 about the delay in her payments, there is no suggestion in any of the letters that the delay was due to illegal discrimination. *See* Def's. Br. in Supp.  Mot. Summ. J., Ex. 27.  She did not seek EEO counseling until December 15, 2005, at which point she alleged discrimination regarding the payment of her quarterly health benefit refund.

A causal connection may be shown by proof that the adverse action followed the protected activity closely in time. "[A] gap in time between the protected activity and the adverse employment action 'weakens the inference of retaliation that arises when a retaliatory act occurs shortly after the complaint.'" *Calder v. TCI Cablevision of Missouri, Inc.,* 298 F.3d 723 (8th Cir. 2002)(internal citation omitted). In *Sowell v. Alumina Ceramics, Inc.,* 251 F.3d 678, 684 (8th Cir. 2001), the court held that a seven-month lapse in time between the protected activity and the alleged retaliatory act was, without more, too long for the incidents to be temporally and therefore causally related.

The alleged protected activity includes a prior EEO complaint closed in April 2002 and the EEO complaint filed in 2005. The alleged retaliatory action took place between July 15, 2001 and December 15, 2005, specifically those instances when Fanning's refund checks were late. The record reflects that Fanning's January 27, 2002-April 20, 2002 payment was not paid until December 2002, and the January 23, 2005-April 16, 2005 payment was not paid until July 2006. *See* Def's. Br. in Supp. Mot. Summ. J., Ex. 20.[3] The activity Fanning engaged in between her two EEO complaints does not meet Title VII's definition of protected activity. She wrote letters to postal management on October 11, 2002, November 9, 2002, December 5, 2002, and December 13, 2002, expressing dissatisfaction with not receiving her FY 02 Quarter 3 (1/27/02-April 20, 2002) payment. *See* Def's. Br. in Supp. Mot. Summ. J., Ex. 27 and Def's. Reply, Ex. B. On July 23, 2004, she wrote her congressman expressing dissatisfaction with not receiving the FY 04 Quarter 1 (10/5/03-11/1/03) and FY 04 Quarter 4 (4/18/04-7/10/04) payments. *Id.*, Ex. 27. Further, in none of these letters does

---

[3]Fanning says a December 2005 payment included a payment for the quarter that ended in April 2005. *See* Pl's. Br. in Supp. Resp., Ex. 5.

Fanning suggest that untimely payments were in retaliation for her EEO complaints.  The Court finds Fanning fails to establish a causal connection between her protected activity and the alleged retaliatory actions.

Even assuming Fanning can establish a *prima facie* case of retaliation as to her late refund payments, there is no evidence to raise a genuine issue of fact that the USPS's proffered reasons for the various delays are pretextual.  According to Carolyn Sims, who was responsible for seeing that the health refund benefit claims were processed, quarterly health benefits refunds are loaded into the Worker's Compensation Information System ("WCIS") by someone in the USPS Headquarters office.  She was required to pull the report from the WCIS which would identify the employees who were eligible for refund payments.  Sims stated that there were several reasons why Fanning's refund checks were issued late.  After the closing of Fanning's Remote Encoding Center in July 2002, the agency code for the installation reverted to Headquarters.  As a result of the change, Sims said she not able to pick up the installation site or receive a copy of Fanning's report without difficulty.  Her January 28, 2002-April 20, 2002 refund payment was not paid until December 26, 2002.  Sims said that on at least one occasion, there appears to have been a glitch in the system in October-November 2003.  The payment was issued sometime after August 19, 2004.

Sims said that in September 2005, an e-mail went out to the USPS stating that Quarter 3 (1/23/05-4/16/05) Health Benefits report had errors, and because of this problem, Fanning's payment for that quarter was paid on July 31, 2006.  Two other employees' refund payments for that quarter were also issued late.  Sims said that of the twenty refund payments due Fanning from July 15, 2001

through April 15, 2006, approximately seven were issued late.  Def's. Br. in Supp. Mot. Summ. J.,

Ex. 20.

In support of her argument that retaliation was the real reason for her refund payments being

late, Fanning asserts that the other employees whose checks were late did not have to resort to

repeated phone calls and letters to the USPS and their congressmen in order to receive their checks,

and there is no evidence that their checks were as late as hers.  She points out, for example, that her

check for the period January 27, 2002 through April 20, 2002, was not issued until February 24,

2003, after she contacted her congressman, and she did not receive a check for the time period of

October 5, 2003, through November 1, 2003, without her congressman's intervention.  *See* Pl's. Br.

in Supp. Mot. Summ. J., Ex. 7.  Fanning complains that Sims ignored her calls, refused to answer

her letters, and put her complaints about late checks "on the back burner."  *Id.*, Ex.8.  Sims testified

as follows:

> Q.  Okay.  Did you ever think when you knew a check was going to be late - the
> report was going to be late so the check was going to be late, did you ever think to
> call Ms. Fanning and say, hey, I know you have been complaining to anybody who
> could answer; this is what's going on, this is why you're not getting the check; this
> is when you'll get it?
> A.  No.
> Q.  Why not?
> A.  To be honest with you, someone that complains like that, I did not want to be
> more or less acknowledged of doing something I wasn't supposed to.  So, no I didn't
> pick up the phone.  No, I probably wouldn't have written a letter because no matter
> what I did, she complained.  She complained even prior to when the payments were
> due.  I mean, even before the report would be up and available at the regular cycle
> time, she complained.  She would write a letter to my DM and say, hey, it's coming
> up, she needs to pay me, and it wasn't even time.
> So I didn't want to do anything to offset (sic) her, to make her think that, you know,
> I was trying to do anything to her because I wasn't.  I had a hard time just trying to
> manage my people and do my job.

Pl's. Br. in Supp. Resp. Mot. Summ. J., Ex. 8, pp. 44-45.

To prove pretext, Fanning must both discredit the USPS's reasons for the delay in payments and show circumstances that would permit drawing a reasonable inference that the real reason was retaliation. *See Gilbert,* 495 F.3d at 918. Fanning has done neither and the Court finds summary judgment is proper on this claim.

**b.  Separation from Employment and Termination of Life Insurance**

Fanning claims the USPS administratively separated her from her employment and cancelled her life insurance in retaliation for her prior EEO activity. Under the USPS Employee and Labor Relations Manual ("ELM"), at the expiration of one year of continuous absence without pay, an employee who has been absent because of illness may be separated for disability. Def's. Br. in Supp. Mot. Summ. J., Ex. 12, ELM 365.342. "*Separation-disability* is a term used to indicate the separation of an employee . . . whose medical condition renders the employee unable to perform the duties of the position and who is ineligible for disability retirement." *Id.* at 365.341. "Before any employee who is on the rolls of OWCP can be separated, the requesting official must submit a comprehensive report to the manager of Heath and Resource Management at Headquarters through the area human resources analyst for injury compensation with appropriate recommendations and documentation." *Id.*, Ex. 30, ELM 545.92. After receiving permission from Headquarters, the employee is removed according to the provisions of ELM 365. *Id.*

Fanning's last day in pay status was September 8, 2008. *Id.*, Ex. 13. Her OWCP claim for PTSD was accepted on August 17, 2000. *Id.*, Ex. 7. Fanning has not returned to work with the USPS since that time. On several occasions, her physician, Dr. James Sims, opined that Fanning was totally disabled and could not perform any type of gainful employment. *Id.*, Exs. 14 and 18. On

11

September 7, 2005, District Manager E.W. Waldemayer requested approval from Ron Henderson, Manager, Health and Resource Management, to separate Fanning from the postal rolls because the medical documentation showed that she would be unable to return to the USPS in the future due to residuals of her injury.  *Id.*, Ex. 15. On October 25, 2005,  Henderson gave his approval to separate Fanning.  *Id.*, Ex. 16.

On November 9, 2005,  Madolyn Wiley, a Human Resources Specialist, wrote Fanning a letter, telling her that it appeared she was eligible for disability retirement and asking her to make an appointment if she were interested in pursuing this option.  Wiley also told Fanning that disability retirement would not affect her OWCP benefits.  *Id.*, Ex. 10.   When Fanning did not respond, the USPS sent her another letter on December 7, 2005, instructing her to contact Larry Harrison, Supervisor, Distribution Operation, within seven days to set an appointment for an investigative interview concerning her medical inability to perform her duties.  *Id.*, Ex. 17.   Harrison further instructed her that if she did not contact him within seven days, the investigation would continue without her input.  *Id.*

On December 13, 2005, Tre Kitchens, plaintiff's present attorney, wrote Harrison, stating he represented Fanning and was in receipt of the December 7 letter. Kitchen stated he and Fanning believed Harrison's letter violated the Settlement Agreement, and related that she had been advised on both legal and medical grounds not to participate in any investigation.  *Id.*, Ex. 23.   Kitchens further stated if Harrison needed any additional information from Fanning or relating to the investigation, he should contact Kitchens.  *Id.*

On September 4, 2006, Fred Davis, Supervisor, Distribution Operations, sent Kitchens a letter asking him, as Fanning's agent, whether Fanning would be able to return to work in the near

future, and, if it were unlikely that she would ever be able to report for duty, to so state and affirm. *Id.*, Ex. 24.  The letter further said that if no response were received, Davis would proceed with an investigation without Fanning's input.  The letter was delivered on September 15, 2006.  *Id.*  There is no record that Kitchens or Fanning responded to the letter, or that Fanning applied for disability retirement.

The USPS mailed a Notice of Administrative Separation letter dated September 28, 2006, to Fanning in care of Kitchens.  The letter was delivered on September 29, 2006.  The letter stated:

> On or about April 21, 2000, you suffered a compensable injury.  For more than one year, you have been continuously absent from duty as you have been on the periodic rolls of the Office of Workers Compensation Programs (OWCP).  It appears unlikely that you will be returning to perform the duties of your position in the near future.  As a result, you are bring administratively separated from the Postal Service.
>
> This is not a disciplinary action, but rather, this is an administrative action based on the above-referenced circumstances and is taken in accordance with the provisions of the Employee and Labor Relations Manual, Section 365.34.  This administrative separation will not affect your OWCP payments.
>
> In addition, this action does not prohibit you from filing an application with the Office of Personnel Management (OPM) for disability retirement.  If you decide to file for disability retirement, you must file an application with OPM within one (1) year from the date of your separation from the Postal Service, when your right to file expires.

*Id.*, Ex. 19.  Fanning claims she did not know of the notice until she received a letter in January 2007, informing her that her life insurance had been cancelled because of her separation from employment with the USPS.  *Id.*, Exs. 31 and 36.   Because Fanning was no longer a federal employee, she was not entitled to life insurance coverage under the Federal Employee's Group Life Insurance.  In December 2007, after she filed the complaint now before the Court, Fanning applied for disability retirement, and her application was approved on June 12, 2008.

Fanning asserts she was separated in retaliation for her prior EEO activity. The Court finds there is no evidence to establish a genuine issue of material fact that the USPS's proffered reasons are a pretext for discrimination. The USPS followed the proper procedures in separating Fanning. When she did not file for disability retirement and her physician stated she would not be able to work again, the USPS administratively separated her. She was still able to file for disability retirement, and she was accepted. Her physician clearly stated she was unable to return to work for the USPS, and she clearly met the requirements for separation. The effect of her separation is that she is no longer on the rolls of the USPS. Staffing is determined by on-roll complement which can adversely impact potential hiring needs. Def's. Br. in Supp. Mot. Summ. J., Ex. 22 at ¶ 18.

Other employees were administratively separated from the USPS for the same reasons as Fanning: Mary Arbeene (September 18, 2006); Horace Bailey (April 12, 2000); Isadore Banks (July 12, 2004); Debra Callahan (March 16, 2007); Regina McKinney (February 9, 2000); Alfred Muldoon (June 24, 2002); Calvin Sanders (January 3, 2007); Steven Tofflemire (August 18, 2006); and George Waleszonia (January 24, 2000). *Id.* at ¶ 24; Ex. 33. Defendant submits an exhibit that shows Bailey, Callahan, McKinney, Muldoon, Sanders, Toffelmire, and Waleszonia did not have any EEO activity. *Id.*, Ex. 34. Arbene did have EEO activity but she did not file her EEO complaint until the USPS gave her notice that she would be administratively separated. *Id.*, Ex 35. Fanning responds that none of the individuals mentioned had a Settlement Agreement with the USPS

The Court finds that Fanning cannot show that the USPS's articulated reasons for her administrative separation and the associated cancellation of her life insurance policy were a pretext for reprisal discrimination.

**c. Conspiracy Claim**

In her complaint, Fanning alleges that "[a]s a direct result of Plaintiff's prior EEO activity and litigation against the USPS, the USPS actively conspired to controvert and/or terminate her accepted OWCP benefits." Compl., ¶ 22. The USPS argues Fanning failed to administratively exhaust her remedies with respect to this claim because she failed to make such an allegation in her EEO complaint, and there is no evidence that Fanning sought to add a conspiracy claim to the issues to be investigated. The USPS asserts the claim regarding her OWCP benefits is not reasonably related to whether her separation was based on illegal discrimination, the issue accepted for investigation. Def's. Br. in Supp. Mot. Summ. J., Ex. 29. Even if the claim were properly before the Court, the USPS argues Fanning cannot establish a *prima facie* case because the challenged action is not materially adverse. Further, the fact is that Fanning is still receiving OWCP benefits and has been continually since 2000.

While she argues that she named numerous USPS employees in her EEO complaint, Fanning did not allege a conspiracy, and the Court finds, as further explained below, that Fanning fails to set forth evidence from which a reasonable jury could find the USPS conspired to deprive her of her OWCP benefits.

## 2. Other Discrimination Claims

In her EEO complaints, Fanning alleged discrimination on the basis of race, color, sex, retaliation, and disability. In her complaint before this Court, Fanning alleges retaliation only. The Introductory Statement describes the action as one "to address violation of a settlement agreement . . . and for Retaliation due to previous litigation and EEO activity . . .. Compl., ¶ 1. Count II of the complaint is entitled "**EEO CLAIMS 1-G-721-0018-07 and 4G-720-0033-06/RETALIATION**". Compl. at 4. Defendant asserts plaintiff withdrew her race, color, sex, and disability claims because

15

she did not allege jurisdiction under the Rehabilitation Act and no claims of race, color, sex, or disability are included in the complaint.  The USPS says it assumed Fanning had decided not to pursue those claims and, if the Court allows plaintiff to amend her complaint to include these allegations, it should be allowed to amend its motion for summary judgment to argue why summary judgment would be proper on these claims as well.

Fanning says she has not withdrawn her claims of race, color, sex, and disability discrimination, pointing out that when asked in interrogatories what type of discrimination she was alleging, she answered: "Please see Complaint.  In addition to the allegations contained in the Complaint: Retaliation Race Gender Sex-Some explanation in above answer." When asked about similarly situated employees who received better treatment, plaintiff responded she could not answer without additional discovery from the USPS.  *See* Def's. Mot. Summ. J., Ex. 25 at 5. Defendant asserts plaintiff submitted interrogatories but she did not ask any questions about similarly situated or comparative employees.

Fanning argues defendant has had notice of her discrimination claims and points out that the USPS identifies in its Statement of Uncontested Facts the names of two individuals, a man and a woman, who received their health benefit refund payments late.  *See* Def's. Statement of Uncontested Facts, ¶ 67.  There is testimony that three men complained on occasion about their quarterly payments being late but did not file EEO complaints and the USPS discussed the late checks with them. *See* Pl's. Mot. Summ. J., Ex. 8 at 33-4.  Fanning argues the USPS has identified similarly situated individuals who received better treatment than she because the USPS discussed their complaints with them but did not discuss her complaints with her.   She also states that there were other employees who had been continuously absent from duty for more than one year and

appeared unlikely to return to duty and were issued notices of administrative separation at the same time as Fanning, *see* Def's. Statement of Uncontested Facts, ¶ 70, but they received better treatment because none of them were operating under the terms of a settlement agreement.

The Court finds Fanning failed to properly plead her race, color, sex, and disability claims before this Court.  Plaintiff asserted jurisdiction under Title VII but not the Rehabilitation Act.   She does not mention disability discrimination in the complaint or in her interrogatories as a type of discrimination she is alleging in her lawsuit.  Further, there is no statement of a claim of race, color, or sex discrimination in her complaint.  Every claim set forth in Count II begins with the phrase: "As a direct result of Plaintiff's prior EEO activity and litigation against the USPS."  Compl. at ¶ ¶ 22-24. The fact that Fanning raised these claims in her administrative EEO complaints does not equate with notice that she is pursuing them in this court.

### 3.     Settlement Agreement

Plaintiff's final allegation is that the USPS breached the settlement agreement entered into by the parties on November 7, 2003.  The pertinent provisions of the settlement agreement are as follows:

> 7)  Fanning claims that she is unable to work at the Postal Service and is currently receiving payments for an accepted OWCP claim for Post Traumatic Stress Disorder (PTSD).  Fanning understands that future payment of those benefits is controlled by another agency of the United States, the Department of Labor, and that the Postal Service does not control whether benefits are paid or a claim is denied or closed.  The Postal Service agrees not to challenge the legitimacy of Fanning's currently accepted OWCP claim or to provide the independent medical examination records and reports of Dr. Diner to the Department of Labor.

> 8) Fanning agrees that she will never reapply for work with the Postal Service.

> 9)  Fanning will look into applying for disability retirement and other options available to her.  Fanning understands that the acceptance of an application for

disability retirement is controlled by another agency of the United States, the Office of Personnel Management (OPM), and that the Postal Service does not make any determination as to whether an application for disability retirement should be accepted or denied.  The Postal Service agrees that it will not oppose the Plaintiff's application for disability retirement.

10) During the time that Fanning's disability retirement application is pending and during the reconsideration, if any, of a decision on Fanning's disability retirement application, Fanning will remain in the same employment status that she is in now, on leave without pay.

Compl., Ex. 1.  Fanning alleges the USPS breached the settlement agreement by conspiring to terminate her OWCP benefits; conspiring to terminate her status as a USPS employee; and conspiring to deprive her of the quarterly health benefit refunds.

"Settlement agreements, including those entered into by the government, are viewed in light of governing contract principles," *Harris v. Brownlee,* 477 F.3d 1043, 1047 (8th Cir. 2007), and a party is not entitled to relief absent a material breach of the agreement.  *Id.*  "Whether a breach of contract is material is measured by examining the 'extent to which the injured party will obtain the substantial benefit . . . reasonably anticipated.'" *Id.* (internal citation omitted).

### a.  OWCP Benefits

When Fanning filed her OWCP claim in 2000, the USPS challenged her claim.  *See* Def's. Mot. Summ. J., Exs. 8 and 9.  Despite the challenge, her claim was accepted.  Fanning has been on the OWCP rolls continuously since 2000, and she is still receiving those benefits.  After the Settlement Agreement was signed, Douglas Lane, Manager of Human Resources, instructed the employees under his supervision that they were not to challenge Fanning's OWCP claim.  *Id.*, Ex. 22 at ¶ 5.  Carolyn Sims testified she was aware that USPS had agreed not to challenge the legitimacy of Fanning's OWCP claim.  *Id.*, Ex. 20 at ¶ 4.

USPS Handbook EL-505, *Injury Compensation*, Section 8 <u>Controversion and Challenge</u>, states that if there is a question as to the validity of the injury or resulting disability, the USPS is obligated to dispute either the entire claim or any element of it by way of a "challenge." Section 8.4 states that the challenge package must be sent to OWCP and notification that the claim is being challenged must be sent to the employee, *Id.*, Ex. 5. Thus, the only way to actively controvert or challenge an employee's OWCP claim is to submit a challenge package to OWCP. Lane states that he is not aware of any challenge by the USPS to the Department of Labor regarding Fanning's claim after the execution of the settlement agreement. *Id.*, Ex. 22 at ¶ 5. Sims states she is not aware of any challenge to the Department of Labor of Fanning's claim after the date of the settlement agreement. *Id.*, Ex. 20 at ¶ 4. There is no evidence that a challenge package was sent to OWCP.

Fanning claims USPS employees conspired to have her status modified so that her benefits would be terminated. There was an internal e-mail discussion between postal employees about the possibility of vocational rehabilitation of Fanning. *Id.*, Ex. 21. Lane e-mailed Arsenia Rhoden, then the manager of injury compensation requesting an update on a discussion they had about the possibility of vocational rehabilitation. *Id.*, Ex. 21 and 22 at ¶ 11. Lane said he thought Fanning would be well-suited for vocational rehabilitation because it was his understanding that the only restriction she had was that she could not work for the USPS. *Id.*, Ex. 22 at ¶ 11. As manager of human resources, Lane was responsible for controlling workers' compensation costs for the Arkansas district. He said that if Fanning could be vocationally rehabilitated, the compensation costs of the USPS would be reduced because the USPS would only have to pay the difference between the salary she earned at her new job and her postal salary. *Id.* at ¶ 13. The USPS has a duty to identify

potential rehabilitation program participants, contact the OWCP district director to review the case to determine the feasibilty of Rehabilitation Program participation, and prepare a referral package. *Id.* at ¶ 14.

Lane said that the internal discussion he had with agency personnel by e-mail was about whether or not Fanning was a candidate for vocational rehabilitation through OWCP; the e-mails he wrote to the Southwest Area office in Dallas are part of the standard process when handling injury claims that are over a year old with no chance of the employee returning to USPS employment. *Id.* at ¶ 17. A referral package was never sent to the Department of Labor, and the e-mails did not change Fanning's status with the OWCP. *Id.* at ¶¶ 16-17.

Fanning responds that while the USPS did not challenge her OWCP claim, several USPS employees discussed changing her status and passed around her medical records during an e-mail discussion in 2005 regarding getting new medical information. She admits the internal discussion did not affect her claim but believes the employees wanted to affect her OWCP benefits. Fanning argues Lane started discussing how to challenge her claim in order to reduce USPS costs, and compensation termination was mentioned in an e-mail to Lane. *Id.*, Ex. 21. She says the only reason the discussion about terminating her benefits did not continue was because Lane and others decided to focus their energies on having her administratively separated from the USPS employee rolls.

The USPS argues that an internal conversation between postal employees about the possibility of vocational rehabilitation for Fanning does not breach the settlement agreement which provides: "The Postal Service agrees not to challenge the legitimacy of Fanning's currently accepted OWCP claim or to provide independent medical examination records and report of Dr. Diner to the

Department of Labor."  There is no evidence the USPS challenged the legitimacy of  Fanning's
OWCP claim after  execution of the settlement agreement or that the internal conversation between
postal employees via e-mail affected her OWCP claim.  Further, there is no evidence that the USPS
breached the settlement agreement by providing independent medical examination records and report
of Dr. Diner to the Department of Labor.

In the e-mail exchange between Rhoden and Lane on May 9, 2005, Rhoden informed Lane
as follows:

> The case is currently being prepared for separation from Postal Service employment
> rolls.  Headquarters' requirement for medical to support separation is that it cannot
> be more than six months old.  Unfortunately, medical in the Injury Compensation file
> that supports separation is over the six month requirement.  The case is on the list for
> OWCP file review for current medical and it will be reviewed at OWCP next week.
> . . . Once current medical is in file we will proceed with separation. . . .

> I need to clarify that when an employee is approved for separation, it does not affect
> our chargeback costs because the employee will still receive compensation payments
> from OWCP; the employee is merely removed from Postal Service Rolls to allow the
> posting of the then vacant position.  Chargeback cost is impacted when the
> employee's compensation is terminated through death, return to work, or
> compensation termination.  We will continue to manage the claim for either return
> to work or compensation termination.

*Id.*, Ex. 21 at 2.   In June 2005, Rhoden sent Betty Chambers, a postal employee, an e-mail asking
"if any updated medical documentation was copied at OWCP this week."  *Id.* at 1.[4]  In July 2005,
Dr. Sims responded to the USPS's request for a current medical status on plaintiff, stating that
Fanning's condition was "chronic/permanent" and that she was permanently and totally disabled.
*Id.*, Ex. 14.  On May 11, 2006, Sims again opined that Fanning was currently unable to work and

---

[4]The USPS explains that this was an inquiry as to whether the OWCP had sent any recent medical
information to the USPS's office of injury compensation.  Def's. Reply to Pl's. Resp. at 5.

would "never" be able to do so.  Def's. Statement of Uncontested Facts at ¶ 54.  Fanning argues that providing updated medical documentation of any kind to the OWCP is expressly prohibited by the settlement agreement.

There is no evidence that Fanning's medical information was being "passed around" in the e-mails, and there is no evidence that the USPS provided "independent medical examination records and report of Dr. Diner to the Department of Labor" in violation of the settlement agreement.

**b.  Administrative Separation**

Plaintiff alleges the USPS breached the settlement agreement by conspiring to terminate her status as an employee.  The USPS did administratively separate Fanning.  Under the settlement agreement, Fanning was to look into applying for disability retirement and other options available to her.  The USPS agreed not to oppose her application for disability retirement.  There is no evidence that she did anything.  As set out above, on November 9, 2005, two years after the settlement agreement was signed, the USPS sent Fanning a letter telling her she was eligible for disability retirement and asking her to call a human resource specialist for an appointment.  After she did not respond, a second letter was sent, asking her to make an appointment for an investigative interview.  Her attorney responded that Fanning would not participate in an investigation and asked that any further correspondence about the matter be directed to him.  In September 2006, the USPS asked Fanning's attorney to respond to two questions.  All this time Fanning did not apply for disability retirement.  Fanning met the requirements for administrative separation and the USPS removed her.  This did not affect her OWCP benefits or her ability to apply for disability retirement.  In fact, Fanning applied after her separation and her application was accepted.

The Settlement Agreement provides: "During the time that Fanning's disability retirement is pending and during the reconsideration, if any, of a decision on Fanning's disability retirement application, Fanning will remain in the same employment status that she is now, leave without pay." Fanning had not applied for disability retirement when she was administratively separated, and as noted above, she was not treated any differently than other employees who were on the OWCP rolls for an extended period of time.

## c.  Health Benefit Refund Payments

Lastly, plaintiff alleges the USPS breached the settlement agreement by conspiring to deprive her of her quarterly health refund payments.  The settlement agreement does not address those payments, and even if the agreement were read to include them, there is no evidence of a conspiracy or that Fanning was deprived of the payments.  Payment were sometimes delayed, but the Court finds, viewing the evidence in a light most favorable to Fanning, that the record fails to establish that the USPS breached the settlement agreement in this respect.

### Conclusion

IT IS THEREFORE ORDERED that defendant's motion for summary judgment [docket entry 8] is hereby granted.  Judgment will be entered for defendant..

DATED this 25th day of February 2009.


/s/Susan Webber Wright

UNITED STATES DISTRICT JUDGE